On behalf of the F1, Mr. Howard Jablecki. On behalf of the Board of Trustees, Mr. Charles Atwell. And on behalf of Mr. Metallo, Mr. Anthony Argyros. Mr. Jablecki. Good morning. Good morning, Your Honors. May it please the Court. My name is Howard Jablecki. I do represent the plaintiff appellant, the village of Lombard, in this matter. Your Honors, the issues and the facts in this case have been litigated numerous times in numerous forums over the past approximately six years. The facts themselves are largely undisputed. And what remains before the Court today is really one simple issue. Should a police officer be entitled to a line of duty pension where it's been previously decided that his condition was not work related? Although the answer to that question should seem fairly obvious, it's nonetheless the question that brings us before this Court today. Now, in order to fully address that issue, there's two major undisputed factual issues that I want to focus on that are essential to any analysis of this matter. First, the defendant was injured in a non-work related motorcycle accident in September of 2005. And that significant injuries in that non-work related accident included injuries to his right knee, specifically his PCL. But when he went back to work, he was not under any restriction, correct? He was released to return to work by his doctor, Dr. Lewis, correct? And at that time, he was still, not only was he a member of the police department, wasn't he also a member of this undercover group at that time as well? He was, Your Honor. He returned to work and returned to work with Dumega Drug Enforcement. So he's got some, he's not sitting at a desk. They're not saying you go back and sit at a desk and run these from the control room. Correct, Your Honor. And there was testimony from Dr. Lewis that he only returned to work because Mr. Mitalo wanted to tough it out. And testimony from Dr. Chudik that although Mr. Mitalo was experiencing significant difficulties with his knee, he wanted to try and tough it out and return to work. But there are two specific separate injuries at issue here. There was the non-work-related injury that caused damage to his PCL. And then there was an injury in September of 2006 to the lateral medial menisci in a work-related injury. Now, these two separate and distinct injuries are at the crux of every proceeding and every issue involved in this case. Now, Your Honor, I was prepared to address the standing issues that the Board had raised in their briefs, but it's my understanding that the Board has waived those arguments, so I'm not going to address them here today. Is that correct? That is correct. Thank you. So really I want to get to the crux of this. It's the effect of the prior decisions on the pension board proceeding. Now, as I mentioned, these issues, these facts have been the same in every proceeding that they've been involved in. The workers' compensation proceedings occurred first. They were litigated before the line-of-duty issues came to the pension board. Specifically, the workers' compensation decision should be binding on the pension board. Why? Why is one administrative agency binding on another administrative agency? First, Your Honor, because the cases say they are. The case law supports the preclusive effect of either a workers' compensation decision in the pension board proceeding or a pension board decision in the workers' comp proceeding. The courts have specifically held that the causal tests in those two arenas are identical. And, therefore, they have been given preclusive effect on numerous occasions in numerous courts throughout time. Now, specifically in the workers' compensation proceeding, the arbitrator found that, one, the PCL injury was not related to the September 2006 work-related injury. And, second, that the injuries that occurred in the work-related injury, the injuries to the lateral and medial menisci, were fully healed and done as of April 2007. So that's important because the arbitrator specifically found that there was a work-related injury, it did not affect the prior PCL injury, and that it was fully recovered as of April 2007. And that leaves only the prior PCL injury to cause the disabling condition. And we have the same set of doctors in both circumstances? The same set of doctors. There were some additional doctors involved in the pension board proceeding that the pension board sent him to under the pension code. But the testimony of both Dr. Chudik, Dr. Lewis, Dr. Bach, all those same doctors were used in both proceedings. The facts were the same. The medical records were the same. The arguments were the same. Then why were there two hearings? I mean, why didn't the pension board just sit and wait for the cost to be done? Well, that's what we argued before the pension board, Your Honor. The village made that argument that, at the minimum, that they should have stayed in the proceeding until the appellate court decision came down, notwithstanding the fact that there was already a judgment in place by the workers' council proceeding that this injury was not work-related. We made the argument before the pension board. The village made the argument before the pension board that they were bound by the pension board's decision. So is this a race to see who gets started first? It's not a race, Your Honor. It's just a matter of which decision comes down first. It's just a matter of which one starts first, which decision is done first? Once a decision is final, Your Honor, that would be the preclusive decision under the doctrines applicable to this analysis, that once there is a final judgment that involves these same facts, these same issues, these same parties, that decision would become binding on any future collateral issue that involves these same issues, just as it should be in this case. You know, I mentioned the numerous courts that have held that way, maybe versus Schomburg held, that the line-of-duty test in pension cases is the same as the arising-out-of-the-course-of-employment test in workers' comp cases. In that case, the village of Schomburg was collaterally stopped from relitigating that same issue of causation after a workers' compensation finding that the injury had or rose out of the course of employment. Now, that case, maybe versus Schomburg, involved application of the Public Employee Disabilities Act, but in analyzing that issue, the Court relied on all the pension board line-of-duty cases because there were none in the PETA context. So relying on those pension cases, the Court specifically found that if you have a finding in one arena, it is binding in the other. In McCulloch versus Industrial Commission, a non-duty disability was granted by the pension board after full hearing and arguments before the pension board. The plaintiff, the injured employee, raised that same causation argument in the workers' comp proceedings, and the Court indicated that he had a full opportunity to litigate the issue of the work-related nature before the pension board, and therefore, he's collaterally stopped from relitigating that same issue before the workers' comp commission. This goes both ways, Your Honors. Had a decision been contrary, had the workers' comp commission found that this was work-related, we wouldn't be making this argument to you today because the pension board would have been bound by that decision. But what we have here is a decision in the workers' comp commission saying that the current condition is not work-related, and therefore, the pension board should be bound by it. In fact, in the case of Dempsey versus Harrisburg, the same issue where a workers' comp case was final, it was applied in a police pension proceeding, and the Court said that it was required to give raised judicata effect to that prior decision. In this particular case, was there any other medical procedure performed or any medical examination performed after the workers' comp decision was final? No. The evidence that was contained, it was the same, Your Honor. The issue was the injuries, and there has been ongoing treatment, I will say that, but the injuries themselves, specifically the injury to the PCL, the surgery was complete, everything was done at the time of the workers' comp decision. But what's important is in the workers' comp decision, it was specifically noted that there was a separate and distinct work-related injury to the lateral medial menisci. That work-related injury was specifically found to be completely healed. He was completely recovered from it. Not only the arbitrator found that, Mr. Metellus, doctors testified to that fact that in April of 2007, those work-related injuries were fully healed. That leaves nothing but the prior work-related injuries, and that was the basis of the finding by the arbitrator that his current condition is not work-related. It's related to the PCL injury that occurred in a non-work-related setting. Where does the soft tissue belong in this? There's some question about not being able to fully investigate. I'm thinking about a now criminal case. I've got to redo my gears here. You know, fully examine the soft tissue and determine what, if any, impact either of these injuries have on that particular issue. How does that fit into both decisions? I understand we're talking about a knee here, so it's a compact area with a lot of intricate parts. But the workers' compensation proceeding considered all of this testimony, all of these arguments, that the medial lateral menisci had an effect worse than the condition of the PCL. The aggravation arguments were made before the workers' comp proceeding, and the arbitrator denied those arguments. They rejected them, saying that there are two separate injuries. And there's evidence in the record that the PCL was instable before the work-related injury, that there were significant limitations for Mr. Metallo, that he was having trouble. And, in fact, surgery was recommended prior to the September 2006 work-related injury. Had the arbitrator found that there was still some effect of that work-related injury on the preexisting non-work-related injury, they would have found that way. But in this case, we have a decision that found that that work-related injury was fully healed. It was completely gone. It was done. As of April of 2007, that injury was fully recovered from that injury. Then why couldn't he get back to work? Your Honor, because of his preexisting PCL injury. I understand the fact that he was toughing it out beforehand. He was willing to tough out the fight through the pain and the instability and the injuries. But there's adequate evidence in the record that he was having these issues prior to the work-related injury, was having difficulty, and was, according to his doctors, willing to tough it out at that time. After the injury, he did have PCL reconstruction, but he's not able to return to work because of that PCL condition. If it was anything else, that would refute the arbitrator's decision that the work-related injury was fully healed. And that's what we have here, a decision that's final, that's been affirmed at every level of appeal. Isn't there an issue about when it becomes final? In other words, didn't the Pension Board render its decision prior to the finality aspect of collateral estoppel? Those arguments were raised, Your Honor. And you would address that how? Absolutely. There were arguments that there was no final decision because the appeal was pending. It had been argued, it had been briefed, but a decision was waiting to come down. Ignoring the fact that there may have been, there may be some questions if that was a final decision, it's our argument that the case law is unclear whether a final decision requires that to come down. But ignoring, assuming that the appellate court decision had to come down prior to the Pension Board, what we have here, it was final at the time the appeal was filed at the circuit court. The application of race judicata collateral estoppel is a legal issue. It's reviewed to no vote. So the circuit court had every opportunity to give preclusive effect to the decision that had come down, that was final, that the appellate court had affirmed at the time that this was on appeal. It was a legal issue. It wasn't limited to the record that was before the Pension Board because it was a strictly legal issue. It wasn't involved in an issue of the facts, the testimony of the evidence in the case. It was a strictly legal issue that the circuit court should have reviewed to no vote and should have given preclusive effect to that final judgment. Now, even ignoring that, the decision came down two weeks after the Pension Board's decision. The village argued before the Pension Board that they should stay in the proceedings to allow it to come down to avoid the situation that we have here today where we have conflicting judgments, conflicting decisions. The decision from the workman's comp appeals panel. Correct. Okay. That, now, and it could have gone to the Supreme Court had the Supreme Court been asked and decided to take it. Correct. So it's not final until the last action is taken. Yes, Your Honor. Which would be the appellate, the Industrial Commission Board. And that there was no appeal taken. The mandate came down shortly thereafter, Judge. This wasn't a long time in understanding that it could have been. I understand your point. But what we're left with and what you need to consider is the fact that we have here sitting here today two conflicting decisions. We have a decision of the workers' commission saying this is not work-related, and you have a decision of the Pension Board saying this is work-related. And all it would have taken, because that decision was already at that point, was for the Pension Board to simply stay the proceedings. It's our argument that even ignoring the fact that this should have been reviewed to no vote and given preclusive effect by the circuit court, that the failure to stay that was clear error that should be reversed by this court. What is the standard for failure to grant that motion? How do we review that? Judge, I would say our argument is that it's a mixed question that goes under the clear error standard. It's not a manifest weight standard because it's not a strictly factual issue contained to the record, but rather a mix of fact and legal issue. Well, but, no, when the Pension Board refused the motion to stay, what would that be? What standard would that be? Would that be an abuse of discretion? Abuse of discretion, correct. Abuse of discretion. Correct. So, specifically, what we have here, Judge, is there was an opportunity and a necessity to avoid the situation we have with the conflicting judgments. The workers' compensation decision involved the same, the village and Mr. Mattano involved the same facts, the same testimony. According to the case law, it involved the same causation standards. Same parties? I'm sorry? Same parties? Yeah, Mr. Mattano and the village all fully participated in the workers' compensation proceeding. Mr. Mattano had a full availability to respond to the arguments, to participate in it, an opportunity to mitigate it every step of the way. And now he's trying to make the same arguments that were rejected in the workers' compensation commission before the Pension Board. And the law is clear. He can't do it. The decision was already made. The same issues were before both forums. The courts upheld that those causation tests are the same. The workers' compensation commission specifically held that the work-related injury was gone after April 2007 and that, therefore, no disabling condition can be the result of that injury. Any finding by the Pension Board, to the contrary, is impermissible under this law. Your Honor, I say thank you for your time. You'll have a chance for a rebuttal. Yes, there will be a chance for a rebuttal. Thank you. All right, so is it Mr. Argyros, Your Honor. Okay, thank you. It's okay. Thank you. Given the, first of all, may it please the court, I'm Anthony Argyros. I have the honor of appearing here today on behalf of Officer Joseph Mattano. I am accompanied today by Mr. Charles Atwell, who is counsel for the Pension Board. In preparation for argument, we agreed to kind of split up issues amongst ourselves, and we thought that time would probably be divided equally. However, I suspect that it sounds like the collateral stop or res judicata issues are of some significance. If I have to go over the seven minutes to address them with the court, Mr. Atwell has agreed to cede me that amount of time. So may it please the court, to reach the desired result, what the village is asking this court to do is first ignore binding Supreme Court precedent for which there is no lack of clarity, that meaning the Bollweg v. City of Springfield case, which says that to apply collateral stop or res judicata, the prior judgment must be final, final meaning the opportunity for appeal having been exhausted. It simply does not and did not exist in this case when the Pension Board, which was the tribunal, made its decision. And even the, I think counsel's laid out a two-week period, the appellate decision came down. There would still have been time, even then, to file a request to the Supreme Court, correct? Absolutely. The workers' compensation decision, I will say one thing, that there are particular rules as to when a workers' comp decision from the appellate panel is appealable to the Supreme Court. Those conditions were not met in this particular instance because you need to have two of the justices in the appellate court panel certify the case as needing review by the Supreme Court. But nevertheless, that possibility did exist as of the time the Pension Board ruled. So you're right, additional review by the Supreme Court was indeed a possibility when the Pension Board considered this case. Did Justice Hoffman actually, he would have been one of the certifiers to hear. That is correct. But he was the only one. He dissented. That is correct. Now, let's talk about one grave error that the village has been trying to convince this court of, and that is that the issues were the same in the 19B hearing before the Workers' Comp Commission and the issues before the Pension Board. They were absolutely not the same. The issue before the Workers' Comp Commission in the 19B proceeding were limited by law to two. First was what was the extent of Mr. Metallo's temporary disability, which is defined, and it's more in detail in the Walker v. Industrial Commission case that I cite in the brief, but it's defined as meaning while the patient is still recuperating from his injury, he's temporarily and then not able to work, temporarily totally disabled. After you've reached a plateau in your recovery called maximum medical improvement or the acronym MMI, at that point your temporary total disability has ceased, and your right to those temporary disability benefits that are an issue in a 19B proceeding ceases as well. In this case, it is clear and undisputed. Mr. Metallo, in the September of 2005 non-duty accident, had injured the posterior collateral ligament, which is this little doohickey here, as part of the fractures, and then he was having some instability of the knee as a result. What is also undisputed is that on September 13th of 2006, when Mr. Metallo is apprehending this violent subject in the course of a drug, you know, entry to a house, he also damages both of these, which are the medial and lateral menisci. And as you can see, these are like cups, and into those cups fit these, which are what they call the tibial plafonds. So they fit in here kind of like ball and socket. After September 13th of 2006, Mr. Metallo never again has normal sockets. The menisci were not repaired. The menisci did not heal completely in the way that counsel is suggesting. The menisci had a procedure performed on them called meniscectomies, just like appendectomy removal or tonsillectomy removal. This was a removal of part of this tissue to smooth it out and try to give the best possible cup this man could have following the damage to these damage that occurred on September 13th, 2006, by all accounts. From that point forward, the need that Mr. Metallo has and the PCL that he has is all superimposed upon a damage to these menisci. So he doesn't have the two sound, healthy cups any longer. And Dr. Chudik clearly explained that that was the reason why the PCL repairs going forward were going to be more troublesome. So that's why, that's the answer to the question Your Honor posed that really was never answered by Mr. Jableki, and that is why couldn't he work afterward when he could work before? The reason is because before, even if we indulge the village in the assumption that there was no additional damage whatsoever to the PCL, he had a damaged PCL with healthy menisci. After the accident, he has a damaged PCL, which now cannot stabilize the knee any longer so long as these cups, the menisci, are damaged. They were not repaired. They did not heal completely. There were portions removed and smoothed out as best Dr. Chudik could. And the workmen's comp heard that or didn't hear that? They did hear that. And what ultimately the decision was is that he had reached maximum medical improvement, not complete healing. He didn't visit Lourdes. It wasn't that he all of a sudden was given new menisci. It was that the healing process after the menisci, he'd had the meniscectomies, and the meniscectomies had been complete. His healing process from the meniscectomies was complete. The workers' comp commission never said, nor did Dr. Bach, that Mr. Motala could return to work at that time. The workers' comp 19B does not say Mr. Motala could go to work. It says he'd reached maximum medical improvement. So the temporary total disability payments should cease when he's reached maximum medical improvement. But there was no evidence then, and no evidence from that point forward, that Mr. Motala could return to work with that knee after it was injured on September 13, 2006. So if you understand what a 19B is and isn't, if you understand the nomenclature of workers' compensation law, that maximum medical improvement does not mean that you're completely healed, because every claim that has a permanency award also has a petitioner that went to maximum medical improvement. That's when the permanency award can be determined. In Mr. Motala's case, there has been no permanency determination even as of yet by the workers' comp commission, because by its very nature, a 19B petition reserves that issue under Thompson v. Industrial Commission. And every 19B decision includes a clause to that effect, including this one. So does that affect its finality as well? No. Finality has to do with the appealability issue. So the 19B became final when the appellate court ruled, and there was no appealability to the Supreme Court. But it only became final as to what was decided, which was the extent of the temporary disability and whether the medical treatment for the PCL was causally related to the September 13, 2006 injury or not. Is that my halftime? That would be. All right. But I'm going to continue as long as we're on these issues. So there is no similarity. The issues are not the same. It's not on all fours. The board all ñ I mean, the village, rather, I think there's another word game. MMI means fully recovered. That's clearly not correct. We also have the issue about the knee instability when they talk about it in the general. The knee has these additional parts. This guy was clearly injured on September 13, 2006. Dr. Bach agrees. All the pension board doctors agree. The two treaters agree. Is there some issue in workman's comp versus pension board about number of witnesses who agree or disagree? Well, there is. Or is it just a practical kind of what happens? I believe the commission, just as this court, is able to consider the number of witnesses supporting a thesis on one side versus the other. Here's the critical thing about Dr. Bach, though. Dr. Bach saw Mr. Metallo in March of 2007 before the PCL reconstruction had occurred. Dr. Bach has not seen Mr. Metallo in his permanent state. Dr. Bach has no opinion about Mr. Metallo in his permanent state. So in my assessment, really, Dr. Bach has no competent opinion on the issue that the pension board is deciding, which is permanent disability. I think Your Honor also makes a point about the kind of work that Mr. Metallo was doing between his non-duty injury and his duty injury. This was not a detective sitting in the office at a desk. This was somebody doing a very rigorous, physically demanding job and someone who cared very much about that job. And that's why he got back after his first injury and wasn't able to afterward. That has been supported by every doctor that's opined about him or seen him after the PCL reconstruction. Going back to, I do want to address the case, the Mabee case and the other cases that were discussed by Mr. Jablecki very briefly. And then I think I'm going to reserve, give Mr. Abell a chance to speak on any other issues. But Mabee is a case where there is a settlement contract, a final adjudication of the workers' compensation case, number one. Number two, Mabee is a case where the workers' comp commission in the settlement contract found that there was a compensable injury. Number three, if you have a compensable injury in Mabee and it's the same in workers' compensation, and it's the same injury that is in dispute about PETA benefits under the Public Employee Disability Act, then of course it should be given collateral estoppel effect. It's a final judgment dealing with the exact same issues between the same parties. All of the requirements are met. Here we have no final judgment. We have no similarity of the issues. And there was no reason to apply it because the issues were not overlapping before the pension board was decided. I'm going to cede the rest of my time to Mr. Abell. Thank you, counsel. Thank you, Your Honor. Good morning, Your Honor. I'm Gerald Abell on behalf of the pension board and my colleagues here. I will just touch on the issues. Now, once we get over the hurdle of the finality issue and the estoppel issues, et cetera, the board had to look at the evidence in this particular case, and this matter would be reviewed under the manifest weight doctrine from that standpoint. Let me ask one question before you get there. Yes. This request to stay your proceedings pending the workman comp proceedings, is this a common motion that's made? I mean, is the ruling pretty clear on the record why you did not or what's the issue? It is not a common motion, Your Honor, but it does happen from time to time. And the board believed that basically this matter had proceeded for a long period of time. In fact, it was, I believe, actually the board heard all the evidence and completed its deliberation of this particular matter, I think, I believe, in June of that year. It wasn't until the written decision was actually handed down in October of that year. So this matter had gone on for a long period of time, and as I say, it was bifurcated from the standpoint that Mr. Mattella was granted a non-duty disability and then it proceeded for the depositions, et cetera, thereafter. So it was a long period of time, and the board was of the opinion that it had to move forward on the matter. And the pension board, again, characteristically, the June, they had their deliberations. The evidence was finished. Did the parties know anything about the final order before October, or was that the first time they learned of the final order? The board did not know about the final. The board, as I recall on this matter, was... I don't believe that they did. I have no reason to believe that they did, except from the standpoint... No, I don't believe that they did because I believe that, my understanding, the first knowledge they would have had in the written decision would have come down on this. I believe, I recall that. Yes, there was a roll call vote. But the analysis and the findings of fact, et cetera, were not provided at that particular time. And our decision is not considered final until such time as a brief history. Because that starts some things rolling as well. That is correct. Okay. That is correct. So the board did, though, for the sake of the record in this particular matter, the board did accept into evidence the documents presented by the village with respect to the workers' comp. And as you will note in the decision, the board determined that that would not have any impact on the board's decision in that particular matter. With respect to the evidence, as far as the manifest weight and the competent evidence in the record, first of all, the board did not dispute the disability. Everybody, I believe, can agree on these issues. He was disabled. There was a severe motorcycle accident, sustained injury to his right lower extremity in 05. He went back to full duty after that, even though the record, I think, will support that he went back with some difficulty. But the municipality, the village took him back to full duty, and he performed full duty. After that, he sustained his injury in 2006, his work related. No question that there was a performance of an act of duty. No dispute on that issue. Where the dispute apparently arises is the issue of whether the work injury accelerated, by some reason aggravated a preexisting situation to cause or accelerate a disability suspension from service. The board believed that it did, that there was competent evidence in the record to support that situation. And the board does understand that there was conflicting evidence. They did struggle with this situation. But in doing so, the board realized or looked at the medicals, and especially their three selected physicians as required by statute. All those three selected physicians, as I recall, and there was competent medical evidence in addition to that, indicating that he did sustain the injury, the work related injury, in September of 2006. He sustained the injury to the meniscus. That was a secondary stabilizer. And by virtue of that, the doctors believed that that was a competent cause of his disability. So those doctors are not suggesting it was the sole cause, and we understand that the law does not require the injury to be the sole cause, but merely a competent cause in aggravating and exacerbation of the situation. That is clearly what the law is. The board believed that there was competent medical evidence supporting a decision that it did aggravate a preexisting condition, injury, and that did suspend him from service. And the fact is that he did not work after that injury. So from that standpoint, the board believed that there was competent evidence to support its decision in this particular matter, and we believe that the court should sustain it based upon that. And I want to make sure I get this straight, because I've only served on the workman's comp panel twice to do things, but at the pension board, you're taking both of the injuries together ultimately because there's an exacerbation of the first, whereas the workman's comp board may have done two separate ones, two separate hearings for temporary disability. Well, I believe what Mr. Ayers is saying, that the pension board in this particular matter looked at it as a 19B as to the temporary aspect of the injury, where the pension board obviously has to look at it from the standpoint of pension disability, from the standpoint of the permanency of the particular injury, whether he can go back to work. Thank you. Thank you. Mr. Spence. Thank you. Mr. Jablanki. Thank you, Your Honors. A couple of points I want to touch on in rebuttal. Although they seem to be blending together, there really are two separate issues here, one the preclusive effect and one the evidence that was before the pension board. The fact that the pension board doctor said one thing in the pension proceeding has no bearing on whether there was a prior judgment that was binding on them. So it's two completely separate issues. If there's a prior judgment that's binding on the pension board, it makes no difference what their doctors are saying in terms of ______. No, but it has to be final, doesn't it? Correct. Okay. At the time they issued their decision. At the time they issued their decision, yes. And what we have here ______. And it wasn't final at the time the board issued its decision, correct? At the time the pension board considered it, the appellate court had not yet ruled. That's correct. And how do we get around the Illinois Supreme Court that has held that that does not make it final? Well, specifically, the circuit court should have considered it. And this court can look at the circuit court's refusal to consider it when it was final on a de novo review and reverse it in that sense. Second, we look at it because, as Mr. Atwell stated, this was heard and a vote was taken in June. They waited until October to issue a decision. We had asked them to state it in June before entering a decision. Had they stated then, their decision would have been delayed another two months. We're not really reviewing what the circuit court did. We're reviewing what the pension board did. Correct. So it doesn't really matter. I mean, the circuit, you know, it's what the pension board did at the time that they did. But when we're looking at the legal issues of the application of race judicata, we do have a final judgment. How do you make something that happens later be final to a prior date? I mean, how do you wrap your head around that? Well, specifically, Your Honor, and some of these cases were addressed in the prior briefs, understanding that Mr. Mattel's argument that until that appellate court comes down, there was no final judgment. Right. And the argument here is twofold. One, I understand that that appellate court came down, that decision came down after the board's ruling. There's still, the board should still have considered the fact that there was a decision by the circuit court, by the arbitrator, by the commission, and that that was pending appeal. We have a decision that then became final by the appellate court two weeks later. It was included in the complaint before the circuit court. It was made part of that record. Mr. Mattel moved to strike it. That was denied. It's part of the case. The circuit court should have looked at that. Right, but we're not here to review the circuit court. I understand the decision comes through from the pension board. And not only in a... I mean, in effect, you're asking us to look beyond what happened on the day the board made its decision, look into the future and say, this is wrong now because of something that happened in the future. Isn't that basically what you're asking us to do? And because of the condition, what was happening at the time that they made their decision. It's twofold. When you look at it as a big picture of the entire situation, you had all these issues that had already been litigated, all of these issues that had been decided on multiple levels, understanding that there was one final decision that was still remaining to come down. And when you look at that, when you look at that in the context of the pension board proceeding, not only did the pension board, should the pension board have stayed that, they waited four months to issue the written opinion to begin with, we could have avoided this entire situation. Would it have made it better if they issued their written decision within two weeks of the hearing? They should have stayed it to begin with, given the context of the status of the workers... So 12 months really doesn't make any difference then. Given the status of the workers' comp proceedings, they should have stayed the proceedings. They should have stayed their decision until that came down. It had already been argued and it had already been briefed. It was simply a waiting and ruling. What makes it an abuse of discretion, though, to not stay it? Because we're left in this situation where we have, under the law, we have two conflicting decisions involving the same causal text. But at that time, they didn't know that. At that time, none of that was known, right? So at that time that they denied the stay, what makes that an abuse of discretion? At the time that they denied the stay, there was a decision that had been affirmed all the way that it was not work-related. So we asked them to stay it not only to find out if that would be affirmed, but it was the applicability of the decision itself. Either way, it came down. If the appellate court reversed, then that decision would be binding, too. It was an abuse of discretion to stay the proceedings entirely until that decision came down to avoid the situation that we're in today with conflicting judgments. You mean it was an abuse of discretion not to stay it? Correct. I apologize. And so we're Monday morning. Then you're asking us to Monday morning quarterback and say, oh, we should have done it the other way, and we wouldn't have been in this situation. It could have gone either way. It could have, and we wouldn't be in this situation regardless of which way it had gone. Yeah, I'm not so sure. But, all right. Anything else? No. Thank you, Your Honor. All right. Thank you very much for your arguments. And, Mr. I'm sorry, Argyros? Yes, Your Honor. The next time you bring that in, see, I would have been a doctor but for those examples, so. We do. I couldn't stand it. Thank you for your arguments. We will make a decision in due course, and we will get spanned in a short recess.